UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LAWRENCE REED,                          CIVIL ACTION
      Petitioner                 SECTION "P"
                                        NO. CV08-0662-A
VERSUS

WARDEN, LOUISIANA STATE                 JUDGE JAMES T. TRIMBLE
PENITENTIARY,                           MAGISTRATE JUDGE JAMES D. KIRK
      Respondent


<u>REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE</u>

Before the court is a petition for writ of habeas corpus filed on May 15, 2008, pursuant to 42 U.S.C. § 2254, in forma pauperis, by petitioner Lawrence Reed ("Reed"). Reed is contesting his April 6, 2000, conviction by a jury in the Louisiana Ninth Judicial District Court in Rapides Parish on one count of second degree murder. Reed was sentenced to life imprisonment and is presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.

Reed raises the following grounds for habeas relief in his petition:

1. Reed's conviction was obtained with insufficient evidence.

2. Reed's constitutional rights were violated when the prosecutor submitted gruesome photographs.

3. Reed's constitutional rights were violated due to prosecutorial misconduct.

4. Reed's constitutional rights were violated because his

trial counsel was ineffective.

5. Reed's right to a fair trial was violated due to cumulative error.

### Rule 8(a) Resolution

This court is able to resolve the merits of this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition. Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

### Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding. Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254 (d)(1), and questions of fact are reviewed under Section 2254(d)(2). Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

A State court's findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The federal court defers to a state court's findings unless they were based on the unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Richardson v. Quarterman, 537 F.3d 466, 473 (5th Cir. 2008), cert. den., 129 S.Ct. 1355 (U.S. 2009), citing Gardner v. Johnson, 247 F.3d 551, 557 (5th Cir. 2001). Under Section 2254 (d)(2), the court should review the ultimate decision of the state courts, not every aspect of their reasoning. Therefore, instead of focusing on the reasoning of state courts in denying habeas relief, the federal court must focus on the outcome of the state

courts' decisions.  <u>Richardson</u>, 537 F.3d at 473, citing <u>Santellan</u> <u>v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001), cert. den., 535 U.S. 982, 122 S.Ct. 1463 (2002).

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.  A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. <u>Martin</u>, 246 F.3d at 476, and cases cited therein.

A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable.  A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable.  <u>Martin</u>, 246 F.3d at 476, and cases cited therein.

When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under

Section 2254 unless the harmlessness determination itself was unreasonable. <u>Mitchell v. Esparza</u>, 540 U.S. 12, 124 S.Ct. 7 (2003). In making that determination, the federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S.Ct. 1710 (1993). <u>Fry v. Pliler</u>, 551 U.S. 112, 127 S.Ct. 2321, 2328 (2007). Thus, habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice. <u>Brecht</u>, 507 U.S. at 637, 113 S.Ct. at 12722.

Under the substantial and injurious effect standard of review, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict. <u>Fry</u>, 127 S.Ct. at 2325. In applying that standard, the Court should treat the error as if it affected the verdict, and the State bears the burden of persuasion as to the harmlessness of the error. <u>Fry</u>, 127 S.Ct. at 2328 n.3. If the court is in "virtual equipoise" as the harmlessness of the error under the <u>Brecht</u> standard, the court will treat the error as if it affected the verdict. <u>Burbank v. Cain</u>, 535 F.3d 350, *8 (5th Cir. 2008), citing <u>Fry</u>, 127 S.Ct. at 2325, 2327.

Facts

The facts of this case, as set forth by the Louisiana Third Circuit Court of Appeal at <u>State v. Reed</u>, 00-1537 (La.App. 3d Cir.

5

05/06/02), 809 So.2d 1261, 1264-1266, writ den., 02-1313 (La. 04/24/03), 842 So.2d 391, are as follows:

"On the morning of September 13, 1999, Defendant killed the victim, Yvonne Smith, with one blast from a shotgun.
          *          *          *
"Early Monday morning, at approximately 5:45 a.m., Jerome Davis, an officer with the Alexandria Police Department, received a phone call regarding a shooting on Southland Street in Alexandria. Upon arriving at the scene, the officer found the victim lying in a small hallway of a house owned by Defendant. After determining that the victim was dead, the officer secured the scene and called for a crime scene investigator. As the officer waited for an ambulance, Defendant walked up to the house. The officer asked him who he was 'and he said, I'm the one who did it.' Officer Davis arrested Defendant and placed him into the patrol car.

"Shortly thereafter, Detective William Bates, a crime scene investigator with the Alexandria Police Department, arrived at the scene. Detective Bates testified that he found the victim lying in a short hallway, with her heels at the entrance to a bedroom, her head lying in the doorway of the living room. Resting on the victim's right hand was a clothes iron. The cord of the iron was under her body. On the living room floor, the detective found an old shotgun with a piece of the stock missing. The detective found the missing piece in the bedroom. The detective concluded the shotgun was fired from the bedroom and that when the gun was fired a piece of the stock broke off. The shotgun was then dropped onto the floor in the living room.

"The detective testified that the shotgun was an old twelve gauge, single-shot shotgun and that '[t]o fire it, just pulling the trigger it wouldn't fire, you'd actually have to cock the hammer on it and cock it back and then once it was cocked back, you could pull the trigger and it would fire.' Once the shotgun was cocked, it would take only a very light pressure on the trigger to fire the gun. The detective examined the shotgun. He stated that the stock was loose from the receiver (the part of the gun which holds the trigger assembly and to which the barrel is attached) and cracked before the shotgun was fired. The detective stated that while he was in the bedroom he noticed that the bedroom window was broken and

a garden hose was hanging in the window. He also noticed that the bed was wet.

"Dr. Steven Cogswell, a forensic pathologist with the Bossier City Laboratory, conducted an autopsy on the victim. Dr. Cogswell testified that from examining the angle of the entry and exit wound and the type of wound caused by a shot striking and entering the skull, and by examining the pattern of the buckshot and blood splatters on the walls behind the victim, he was able to determine that the end of the barrel of the shotgun was between one and one-half feet to four feet from the victim's head when it was fired. He testified the shotgun was probably held by the shooter somewhere between his hip and his arm pit when it was fired. Dr. Cogswell stated the buckshot struck the victim's head at a height of 52 inches from the floor, skimming the left side in the area of the temple, literally evacuating the upper portion of the brain from inside the skull. The shot pattern struck the wall, which was one to one and one-half feet behind the victim, at a level of 63 inches from the floor indicating the shotgun had been aimed in an upward direction at the time it fired. The doctor further testified that he found no evidence of gunshot soot or powder burns on the victim's hands or arms.

"The doctor testified that a six-foot cord from a clothes iron which was on top of the victim's hand was lying stretched out under the victim's body.

"Doctor Cogswell also testified that the victim's blood ethanol level at the time of death was .08 percent and that a urine drug screen tested positive for cocaine. The doctor stated that the victim could have ingested cocaine any time from twenty-minutes up to three days before she was shot. He also testified that a glass crack pipe was found among her personal effects.

"Defendant testified that on the morning of the incident, at approximately 4:45 a.m., the victim woke him by banging on his bedroom window. She demanded to be let in. Defendant testified that the victim had lived with him for about four months, but she had moved out two weeks prior to the shooting. He stated that during that two-week period, the victim returned to the house a number of times to harass Defendant for various reasons. This particular morning the victim wanted to come into the house to get some of her belongings she had left

behind. Defendant testified that he had taken most of her belongings to her mother's house the preceding Sunday; all that was left was in a clothing basket in the front room. Defendant said he told her to leave and to come back later in the morning. A few minutes later, the victim broke the bedroom window and stuck a garden hose in the window and sprayed Defendant while he was in bed. He went to the front door and yelled at her to leave. In response, she turned the hose up full blast. Defendant stated he sat for a while until he could not stand hearing the water run any longer and went to the door. At that time, she pushed her way into the house. Defendant went outside and turned off the running water.

"Defendant testified that when he went back inside, the victim ran around the house swearing at him and making demands. He stated that when he agreed with her to try and get rid of her, she would drop it and make another demand.

> 'A. She made attempts to get-like she was going to get the meat. But looked like she seen that wasn't going to bother me. Looked like she would do things that she know would bother me. And she could have had all the meat. I didn't care. And since that wasn't bothering me, she shut the refrigerator and told me-well, she used profanity again.'

"He stated that he twice took her by the arm and walked her to the door in attempts to make her leave and both times she broke away from him. Finally, while standing in the kitchen, Defendant testified that she struck him with a clothes iron on the back of his shoulder.

> 'A. From past experience, I know that anything she grab, she will use it. So when I seen her grab it and she raised it up, I ducked. I leaned to the side like this. Instead of hitting in the head, she hit me on my shoulder. Back part.'

"At that point, Defendant stated that he ran into his bedroom and grabbed the loaded shotgun, which was beside his bed, on the floor, and cocked it. Defendant testified that he intended to shoot it close enough to her to scare her. He stated that had the victim stayed in the kitchen he was going 'shoot the cabinet off the damn wall.'

However, when he turned around, she was standing right there in the doorway. Defendant testified as follows:

> 'In order to avoid from accidently shooting her, I wanted to make sure the barrel was passed her before I shot the gun. So I wanted to put the gun passed her. And as I went in an attempt to put the gun passed her, she brung [sic] the iron up, over and it hooked the gun so it kind of went forward toward her and it went off.

> "Defendant testified it was still dark and he could not see her well. He stepped over her and walked into the living room, where he saw her. He dropped the shotgun and fell to his knees in shock. He stated that after a few minutes he came to his senses and ran to his brother-in-law's house, which was a block away. There he told his sister to call the police."

<u>Law and Analysis</u>

<u>Issue No. 1 - Sufficiency of the Evidence</u>

Reed contends his second degree murder conviction was obtained with insufficient evidence. Specifically, Reed contends he accidentally shot his victim and argues there was no evidence that he had the specific intent to kill the victim.

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. <u>West v. Johnson</u>, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), citing <u>Jackson v. Virginia</u>, 443 U.S. at 322-26, 99 S.Ct. at 2791-92. To apply this standard, the court looks to elements of the offense as defined by state substantive law.

Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2001). All
credibility choices and conflicting inferences are to be resolved
in favor of the verdict. A determination fo a factual issue made
by a State court shall be presumed correct, and the petitioner
shall have the burden of rebutting the presumption of correctness
by clear and convincing evidence. Ramirez v. Dretke, 398 Fo2d 691,
693 (5th Cir. 2005).

A jury's determination of witness credibility, the inferences
made on the evidence, and the jury's reasonable construction of the
evidence is entitled to a great deal of deference by a reviewing
court. Marshall v. Lonberger, 459 U.S. 422, 433-35, 103 S.Ct. 843,
850-51 (1983). In addition, where there has been a thoughtful
review of the sufficiency of the evidence by a state appellate
court, that court's findings are entitled to great weight.
Jackson, 443 U.S. at 322 n.15, 99 S.Ct. at 2790 n.15.

La.R.S. 14:30.1 provides in pertinent part: "A. Second degree
murder is the killing of a human being... (1) When the offender has
a specific intent to kill or to inflict great bodily harm."
Specific intent is that state of mind which exists when the
circumstances indicate that the offender actively desired the
prescribed criminal consequences to follow his act or failure to
act. La. R.S. 14:10(1). Such a state of mind can be formed in an
instant. State v. Cousan, 94-2503 (La. 11/25/96), 684 So.2d 382,
390. Specific intent is a state of mind and, as such, it need not

10

be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. <u>State v. Davis</u>, 411 So.2d 2, 5 (La. 1982). Also, <u>State v. Graham</u>, 420 So.2d 1126, 1127 (La. 1982). Thus, specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. <u>State v. Jackson</u>, 976 So.2d 279, 284 (La.App. 2d Cir. 2008)(although the defendant argued he was only trying to scare the victim by firing his gun near her, but did not intend to actually shoot her, the court found that testimony was contradicted by the defendant's taped statement to law enforcement and was inconsistent with the apparent trajectory of the bullet), citing <u>State v. Robinson</u>, 2002-1869 (La. 4/14/04), 874 So.2d 66, cert. den., 543 U.S. 1023, 125 S.Ct. 658 (2004). Also, <u>State v. Davis</u>, 411 So.2d at 6; <u>State v. Nguyen</u>, 05-KA-569 (La. App. 5th Cir. 2/3/06), 924 So.2d 258, 263(the jury did not believe the defendant's testimony that he only intended to frighten the victim, where a witness testified that twenty minutes elapsed between the time of the fight and the shooting). However, specific intent to kill or commit great bodily harm may not reasonably be inferred from the sole fact that someone was killed. <u>State v. Davis</u>, 411 So.2d 2, 6 (La. 1982).

In the case at bar, Reed's defense was that he accidentally shot the victim, so he did not have the specific intent to kill her (Resp. Ex. B, pp. 101-101). There was no direct evidence that Reed

had the specific intent to kill the victim.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 SO.2d 31, 38 (La. App. 1st Cir. 1984). When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Moten, 510 So.2d 55, 61 (La. App. 1st Cir.), writ den., 514 So.2d 126 (La. 1987). In Louisiana, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common practice. State v. Shapiro, 431 So.2d 372 (La. 1982). When circumstantial evidence is used to prove the commission of an offense, La.R.S. 15:438 mandates that, assuming every fact to be proven that the evidence tends to prove in order to convict, it must exclude every reasonable hypothesis of innocence. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Porretto, 468 So.2d 1142, 1146 (La. 1985).

In the case at bar, the physical evidence showed the victim was intoxicated and had ingested cocaine at some point before she

was killed and that, just prior to her death, she had broken Reed's bedroom window, shoved the garden hose through it, and turned the water on so that it sprayed into his bedroom (Resp. Ex. B, pp. 33, 82). According to Reed, after he opened the door to let the victim into his home, the victim gathered up some things but would not leave, instead yelling at Reed and hitting him in the shoulder with a clothes iron (Resp. Ex. B, pp. 97, 99). Reed testified he then retrieved his shotgun from a closet, intending to fire it at nearby cabinets in order to frighten the victim into leaving (Resp. Ex. p. 100). However, the victim began swinging the iron at him and hit the gun, causing him to accidentally shoot her (Resp. Ex. B, p. 101).

The State introduced forensic and ballistic evidence to show Reed was close to the victim when he shot her, and that he must have had the gun cocked and held at his hip at the time it went off (Tr. Ex. B, pp. 61-62, 75-77). The evidence also showed the victim fell backward when she was shot, indicating she was not leaning forward to hit or grab the gun (Resp. Ex. B, p. 74). The State argues this evidence proves Reed had the specific intent to kill the victim.

The appellate court found there were two circumstances from which the jury could have inferred specific intent to kill - that the victim was shot at close range and that the victim and the defendant were involved in an altercation at the time of the

shooting.  <u>Reed</u>, 842 So.2d at 1266.  The Louisiana Court of Appeal recognized the need for additional evidence, other than the fact that someone was killed, to prove specific intent, carefully reviewed the physical evidence in detail, and found it constituted additional evidence to support the inference of specific intent. The Court of Appeal also reviewed Reed's claim that the State only proved, at most, that he committed manslaughter.  However, the court noted that the jury clearly believed that the actions of the victim, a 5'2" woman, were not sufficient to provide the average person (in this case a 5'10" man) into losing his self-control and grabbing a loaded twelve gauge shotgun just to frighten her.  A jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence is entitled to a great deal of deference by a reviewing court.  <u>Marshall v. Lonberger</u>, 459 U.S. 422, 433-35, 103 S.Ct. 843, 850-51 (1983).  In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight. <u>Jackson</u>, 443 U.S. at 322 n.15, 99 S.Ct. at 2790 n.15.

The jury could reasonably infer the Reed had the specific intent to kill or commit great bodily harm to the victim from the facts that he pointed the gun at her at close range and shot her, and other evidence which showed she did not cause the gun to go off by somehow hitting it and that she fell backward when shot,

indicating she had not been leaning forward to hit or grab the gun.

Reed has failed to rebut the state court's factual finding of specific intend with clear and convincing evidence. When viewed in the light most favorable to the conviction, there is sufficient evidence to support the jury's finding of specific intent and Reed's conviction for second degree murder. This ground for relief is meritless.

Issue No. 2 - Gruesome Photographs

Next, Reed contends his constitutional rights were violated when the prosecutor submitted gruesome photographs to the jury.

Mere violation of evidentiary rules by the state trial court does not in itself invoke habeas corpus relief. Panzavecchia v. Wainwright, 658 F.2d 337, 340 (5th Cir. 1981). The admission of improper evidence in a state criminal trial will constitute grounds for habeas relief if fundamental fairness was prevented thereby. What elevates the mistake to a constitutional plane is at least two-fold. First, the mistake must be material in the sense of a crucial, critical, highly significant factor. Second, it must have some state complicity in it. Shaw v. Estelle, 686 F.2d 273, 275 (5th Cir. 1982), cert. den., 459 U.S. 1215, 103 S.Ct. 1215, 75 L.Ed.2d 453 (1983), and cases cited therein. Also, Hills v. Henderson, 529 F.2d 397 (5th Cir. 1976), cert. den., 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).

In Louisiana, the test of admissibility for allegedly gruesome

photographs is whether the probative value of the photographs outweighs the probable prejudicial effect that my result from their display to the jury. Photographs which illustrate any act, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. State v. Hendricks, 38,945 (La. App. 2d Cir. 9/22/04), 882 So.2d 1212, 1216, writ den., 896 So.2d 1000 (La. 03/18/05), citing State v. Lindsey, 404 So.2d 466 (La. 1981).

In the case at bar, the State introduced the photographs to show the position of the victim's body on top of the clothing iron cord, the clothing iron on top of her hand, and the trajectory of the shot, which was displayed by the angle of the shot through the victim's head and the location of the splatter of blood and brain matter (Resp. Ex. B, pp. 41-44, 74, 87-88). That evidence tended to show how close Reed was to the victim and the angle of the gun when the victim was shot, and disprove Reed's claim that the victim swung the iron at him and somehow caused the gun to go off. Thus, the photographs were relevant to shed light on the contested issue of specific intent and were admissible.

Since Reed's trial was not rendered fundamentally unfair by admission of the photographs of the victim into evidence, this ground for relief is meritless.

Issue No. 3 - Prosecutorial Misconduct

Next, Reed contends his constitutional rights were violated

due to various acts of prosecutorial misconduct.

The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension. Prosecutorial misbehavior, alone, does not constitute a wrong of constitutional dimension and does not require a new trial. <u>Smith v. Phillips</u>, 455 U.S. 209, 102 S.Ct. 940 (1982). Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, a new trial is required only when the tainted evidence was material to the case. The materiality requirement implicitly recognizes that the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes. <u>Smith</u>, 455 U.S. at 220 n.10, 102 S.Ct. at 947 n.10.

In the case at bar, Reed contends the prosecutor mis-stated witness testimony to the jury, and introduced seventeen very graphic photographs to the jury. As discussed above, the admission of graphic photographs of the victim was not erroneous and, therefore, did not constitute prosecutorial misconduct. The prosecutor's statements as to the witnesses' testimony are

discussed below.

1.

Reed contends the prosecutor erred when she informed the jury
that the victim could not have grabbed the weapon because Dr.
Cogswell did not find soot or powder burns on the victim's hands
or arms.  Reed argues that Dr. Cogswell stated that, "if you grab
the barrel slightly back from the muzzle, obviously you wouldn't
have any searing or soot on it."  However, Dr. Cogswell testified
(Resp. Ex. B, Tr. p. 69),

> "One of the things that Detective Bates and I discussed
> as part of the  — one of the many possible scenarios we
> were trying to work out — was if she had had [sic]
> grabbed the muzzle of the shotgun.  And so of course,
> you look very closely at both hands to see if you have
> evidence of either injury there or that that [sic]
> charring or searing that indicates the hand was right
> near the muzzle.  *Additionally if you grab the barrel
> slightly back from the muzzle, obviously, you wouldn't
> have any searing or soot on it, but you probably have
> smoke or soot on your forearm.*  Because it's very close
> there to the — Remember we've got to have the muzzle of
> the gun at least a foot and a half away from her head.
> So we've got to get out that far, which is pretty much
> an arm's length, maybe a little bit bent arm, kind of
> grab it you're going to go back from the muzzle.  You've
> got to come back because you've got no injury to the
> hand.   So in that case the forearm is going to be
> relatively close to the path of all the stuff coming out
> of the barrel, the shot, the smoke, the powder,
> etcetera.  *And so it's very likely that some of that
> might be deposited on either of the forearms.  In this
> case we really didn't find any."* [Emphasis added.]

Clearly, Dr. Cogswell conditioned his general testimony with

18

the more specific statement that, had the victim grabbed the barrel slightly back from the muzzle, she would probably have had smoke or soot on her forearm instead of her hand, but there wasn't any on either her hand or her forearm. Dr. Cogswell again emphasized that point by stating (Resp. Ex. B, Tr. p. 77): "I can say that the arm was mostly likely not adjacent to the barrel of the gun. I would have expected to see some stippling, etcetera on it."

Dr. Cogswell clearly testified that, since the victim did not have any soot on her hands or arms, she did not grab the gun. Therefore, the prosecutor did not mis-state Dr. Cogswell's testimony by stating that no soot or powder burns were found on the victim's hands or arms. This argument is meritless.

2.

Next, Reed contends the prosecutor mis-stated the evidence by informing the jury that the victim could not have struck the weapon with the clothing iron because a portion of the cord was found underneath the victim's body (Resp. Ex. B, Tr. pp. 130-131), when Dr. Cogswell admitted there are any number of variables that could result form a portion of the cord being underneath the victim's body, and the possible scenarios could be continued. However, Dr. Cogswell actually testified in response to

19

defendant's hypothetical questions presenting different scenarios as to how the six foot iron cord could have ended up underneath the victim's body if the victim was swinging the iron at Reed. Dr. Cogswell stated (Resp. Ex. B, Tr. pp. 86-87),

> "Sir, you're introducing variables that just are — we can have any number of different variables in this and we can continue possible scenarios ad nauseum, but a 5'2" woman with that iron cord — It does not seem likely to me is going to be able to swing it from right to left such that the cord is going to come around — all the way around her body such that when she collapses, it's going to be behind her with the iron back on this side running underneath her waist and into the next room. ...I'm saying that I can't envision a scenario in which you could do that."

Therefore, in this instance, Reed is misstating Dr. Cogswell's testimony, rather than the prosecutor. Dr. Cogswell stated he could not come up with any scenarios in which the victim could have been swinging the iron at Reed and yet ended up with the cord underneath her body. Since the prosecutor did not misstate Dr. Cogswell's testimony, this claim is also meritless.

3.

Next, Reed argues the prosecutor committed misconduct by informing the jury that the victim could not have been holding the iron at the time of the incident because there was blood on the handle of the iron (Resp. Ex. B, Tr. p. 131), when both Detective Bates and Detective Beeson admitted they found a clothing iron in

the victim's hand.

In response to the question whether he had found a clothing iron in the decedent's hand, Detective Bates testified (Resp. Ex. B, Tr. p. 53), "Yes, I did. ...It was actually kind of just laying on top of her hand. ... Yeah. Her hand's on the floor and it's kind of laying on top of her hand, where she doesn't have a grip on it." Detective Beeson testified, in describing the location of the victim (Resp. Ex. B, Tr. p. 29), "Pretty much in this room here. I believe there was a vacuum cleaner over in this little corner here. The victim was laying here and I think there was an iron in her hand." Det. Beeson also stated that Det. Bates took the photographs (Resp. Ex. B, Tr. p. 30). The prosecutor argued, "And then you've got the blood on the handle of the iron. How did that happen if she's got it in her hand? The only way it could have happened is that it was laying there when she got shot. And it fell or he kicked it when he had to step over her to get out of the bedroom."

Contrary to Reed's assertion, the detectives did not "admit" they found the iron in the victim's hand. Detective Bates gave the positive, specific testimony as to the precise location of the iron on top of the victim's hand, while Detective Beeson was not sure how the iron was situated. Therefore, the prosecutor did not

mis-state the detectives' testimony by informing the jury that the
victim could not have been holding the iron. This argument is
also meritless.

4.

Finally, Reed complains the prosecutor argued to the jury that
the victim could not have grabbed or struck the weapon because the
weapon was not in close enough contact with her, when Dr. Cogswell
admitted the weapon could have been as close as one and one-half
feet. However, the prosecutor actually argued the victim was shot
from a distance of between one and one-half feet and four feet, as
Dr. Cogswell testified,[1] but that there was no evidence to indicate

---

[1] Dr. Cogswell, a forensic pathologist, testified (Resp.
Ex. B, Tr. p. 65):
> "And the range of fire on this is not contact, because
> we don't have searing. It's not close-range pebble
> [sic] feet because we don't have the sort [sic] or the
> stippling. But we've got the main shot charge coming
> in and pretty much one single hole with a few little
> tiny satellite edges - or not satellite, but cookie-
> cutter edges to it. So we're out there probably in
> the three to four foot range based on just the spread
> of the shot itself. We can't do anything with the gun
> powder and the soot because we're past that — that
> distance. But we're working with the spread of the
> shot. So that's pretty much the range we're in. Now
> if we get up real close, like in the less than one
> foot range, we're going to expect to see the soot and
> the particles of gun powder that are abrading the skin
> like the sandblaster, but we don't have that. So we
> can give a fairly good estimate that the range between
> the muzzle of the shotgun and her head is somewhere

the victim had grabbed the gun, since there was no burning, soot, or stippling on her arm.

Contrary to Reed's assertion, the prosecutor did not argue the victim could not have grabbed or struck the gun. Instead, the prosecutor argued the physical evidence did not indicate she had done so. Therefore, the prosecutor did not misstate the testimony in this respect, either.

Since Reed has not proven the prosecutor engaged in misconduct which rendered his trial fundamentally unfair, this ground for relief is meritless.

## Issue No. 4 - Ineffective Assistance of Counsel

Next, Reed contends his constitutional rights were violated because his trial counsel was ineffective. Specifically, Reed contends his counsel failed to attempt to move for appointment of

---

> within about a foot and a half and maybe out to four feet or so. And that's really about as good as we can do in getting the range."

Dr. Cogswell further stated (Resp. Ex. B, Tr. p. 76): "Again the muzzle of the shotgun was somewhere between probably a foot and a half and four feet of her head when it was fired. Obviously if it was at the foot and a half range, her arm reach plus the iron would have given her the ability to strike the muzzle of the shotgun." However, Dr. Cogswell stated that he did not believe the victim had grabbed the gun, stating as to the location of the victim's arm or hand or the iron at the time gun was discharged (Resp. Ex. B, Tr. p. 77): "I can say that the arm was mostly likely not adjacent to the barrel of the gun. I would have expected to see some stippling, etcetera on it."

an investigator, a ballistics expert, and a crime scene (or blood splatter) expert to support his defense of an accidental shooting and to counter and impeach the government's experts.

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must show that his counsel's performance was both deficient (i.e., that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (i.e., that errors by counsel "actually had an adverse effect on the defense). The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. On the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, he must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Anderson v. Collins, 18 F.3d 1208, 1215 (5th Cir. 1994), and cases cited therein.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

unnecessary. Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993), citing Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 1052, 2066 (1984). A determination of whether an investigation is reasonably adequate depends upon a variety of factors, including the number of issues in the case, the relative complexity of those issues, the strength of the Government's case, and the overall strategy of trial counsel. Baldwin v. Maggio, 704 F.2d 1325, 1333 (5th Cir. 1983), cert. den., 467 U.S. 1220, 104 S.Ct. 1669 (1984). However, bare allegations do not suffice. A defendant or petitioner, who alleges a failure to investigate on the part of his counsel, must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Nelson, 989 F.2d at 850, citing United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989). Under Strickland, even where trial counsel has failed to adequately investigate a case, a defendant must demonstrate that he has been prejudiced by his counsel's failure. See Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir.1986), cert. den., 479 U.S. 1030, 107 S.Ct. 873 (1987). To show prejudice, the petitioner must prove that an alleged breach of his attorney's duty to investigate resulted in an actual and substantial disadvantage to the course of his defense. Baldwin, 704 F.2d at 1333.

Reed argues that his attorney should have obtained experts and an investigator to adduce evidence which would counter the State's

evidence.  However, Reed has not shown that, even it his attorney had moved for and obtained court-appointed experts and a private investigator, they would have obtained evidence which opposed, rather than coincided with, the evidence adduced by the State's experts.  Moreover, Reed has not alleged or shown what specific evidence a private investigator, a ballistics expert, or a crime scene expert would have found that the State's witnesses and experts did not find, and how that evidence would have favorably affected the outcome of his trial.

Therefore, Reed has not demonstrated a reasonable probability that, had his attorney obtained expert services, the result of the trial would have been different.  This ground for relief is also meritless.

Issue No. 5 - Cumulative Error

Finally, Reed contends his right to a fair trial was violated due to cumulative error, in violation of the Constitution.

Several errors taken together can violate a petitioner's right to due process and cause the trial to be fundamentally unfair. However, it is a highly exceptional case which warrants relief on a cumulative error analysis.  The fundamentally unfair trial which violates due process is rare, but when it does occur this analysis is available to petitioners.  Derden v. McNeel, 938 F.2d 605, 610 (5th Cir. 1991), on rehearing, 978  F.2d 1453 (5th Cir. 1992), cert. den., 508 U.S. 960, 113 S.Ct. 2928 (1993).

Reed has not proven that errors occurred in his trial. Therefore, Reed cannot show his trial was rendered fundamentally unfair by the cumulative effect of several errors. This ground for relief is meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Reed's habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 28th day of April, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE